UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**HANSEN STORAGE COMPANY INC.,**

    Plaintiff,

    v.                                                       Case No. 23-CV-362-SCD

**EMPLOYERS MUTUAL CASUALTY COMPANY,**

    Defendant.

## DECISION AND ORDER GRANTING EMPLOYERS MUTUAL CASUALTY COMPANY'S AMENDED MOTION FOR SUMMARY JUDGMENT

    This diversity action involves a dispute between Employers Mutual Casualty Company and its policyholder, Hansen Storage Company, Inc., about damage Hansen's commercial storage facility incurred when heavy snow and ice caused its roof to collapse. EMC acknowledged coverage for most of the damages and paid Hansen millions of dollars on its claim. However, the insurer denied coverage for damage sustained to the freezer floor, asserting that several exclusions in Hansen's commercial insurance policy precluded coverage for that portion of the claim.

    After the parties failed to resolve the coverage issue, Hansen filed this lawsuit seeking (among other things) declaratory judgment that no exclusion in the company's insurance policy eliminates coverage for any of the damages sustained to its building. The day after the lawsuit was filed, EMC demanded appraisal under two provisions in the insurance policy that permit either party to demand an appraisal on the amount of loss. When Hansen rejected the demand, EMC filed a counterclaim seeking to compel appraisal and later moved for summary judgment on that counterclaim. Because the undisputed facts show that EMC properly

demanded appraisal under the policy and that the parties do not agree on the amount of loss concerning Hansen's claims, the court will grant the insurer's motion.

## BACKGROUND

Hansen offers warehousing space in the Milwaukee area, including cooler, freezer, and dry storage. Compl. ¶ 9, ECF No. 1-2 at 5–15. On February 24, 2021, the roof of Hansen's cold storage facility collapsed under the weight of snow and ice. Compl. ¶¶ 20–24; Def.'s Facts ¶ 3, ECF No. 31; Pl.'s Facts ¶ 30, ECF No. 47. Hansen immediately reported the insurance claim to its commercial provider, EMC. Def.'s Facts ¶ 4. On February 22, 2022, Hansen submitted a proof of loss to EMC for property damage and lost business income that the company said totaled nearly $13 million. Def.'s Facts ¶ 5; Pl.'s Facts ¶ 31. EMC paid Hansen over $7 million on the claim, finding that the company's commercial insurance policy covered damages related to the collapse of the roof, including lost business income. Def.'s Facts ¶ 7. However, according to EMC, the policy excluded damages related to floor slab movement and related building distress (limited to one masonry wall and bracing a portion of the ceiling) because those damages were caused by earth movement from frost heave. Pl.'s Facts ¶¶ 32–35 (citing Hansen Aff. Ex. B, ECF No. 44-2). The parties attempted to resolve that coverage issue, including via private mediation, but they were unable to reach an agreement. Pl.'s Facts ¶¶ 36–38, 43.

On February 20, 2023—less than a week after the unsuccessful mediation—Hansen sued EMC in Wisconsin state court, asserting claims for declaratory judgment, breach of contract, and bad faith. *See* Compl. ¶¶ 31–61. The following day, EMC demanded appraisal under the policy, which allows either party to demand an appraisal when the parties disagree on the amount of the loss in connection with the claim, including to the building at issue and

for lost business income. Def.'s Facts ¶¶ 19–25 (quoting Compl. Ex. A, ECF No. 1-2 at 166, 174); *see also* Dannewitz Decl. Ex. 1, ECF No. 32-1. EMC acknowledged that coverage issues were intertwined with the valuation issues, and so they proposed the appraisal panel could separately identify and segregate amounts and periods of time relating to issues for which coverage was disputed. EMC also identified its appraiser and asked Hansen to do the same. Hansen objected to the demand for appraisal as untimely and invalid because it was submitted after the company initiated litigation. Def.'s Facts ¶ 26 (citing Dannewitz Decl. Ex. 2, ECF No. 32-2).

A few weeks later, EMC removed the matter to federal court, ECF No. 1,[1] and filed a counterclaim for declaratory judgment compelling appraisal, ECF No. 5 at 26–30. The matter was randomly assigned to this court, and all parties subsequently consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 7, 11. On September 5, 2023, EMC filed a motion for summary judgment on its counterclaim. *See* Def.'s Mot., ECF No. 30. That motion is fully briefed and ready for resolution. *See* Def.'s Mem., ECF No. 31; Pl.'s Br., ECF No. 43; Def.'s Reply, ECF No. 46.

## LEGAL STANDARD

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---
[1] The court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1).

(1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether a genuine issue of material fact exists, I must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255).

## DISCUSSION

The parties' dispute centers on two appraisal provisions in Hansen's commercial insurance policy. The appraisal provision concerning property coverage provides that, if the parties "do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal." ECF No. 1-2 at 166. The demand must be in writing and, once appraisal is demanded, each party must select a competent, independent appraiser. "The appraisers will then determine and state separately the amount of each loss" and, if requested, "will also determine the value of covered property items at the time of the loss." *Id.* The policy has a similar appraisal provision for income coverage: "If 'you' and 'we' do not agree on the amount of net income (net profit or loss before income taxes), payroll expense, and operating expenses, or the amount of loss, either party may demand that these amounts be determined by appraisal." *Id.* at 174. The appraisal process for income coverage disputes follows the same appraisal process used for property coverage disputes.

EMC seeks to compel appraisal, arguing that the insurer has satisfied both prerequisites for invoking appraisal under the policy: a disagreement concerning the amount of loss and a written demand for appraisal. According to EMC, the parties' dispute involves three primary issues: (1) the amount of loss to the building; (2) the amount of business income

4

loss; and (3) the availability of coverage for floor slab damage and related building distress that EMC says are unrelated to the roof failure. EMC contends that the parties are millions of dollars apart on the first two issues and that there's a valuation dispute concerning the floor issue irrespective of whether the policy covers that loss. Also, it's undisputed that EMC made a written demand for appraisal on February 21, 2023, and that Hansen rejected the demand.

Hansen resists appraisal for two reasons. First, Hansen maintains that EMC's right to demand appraisal extinguished when Hansen filed suit. Second, Hansen asserts that appraisal is not appropriate here because the parties do not actually disagree on the amount of loss—that is, the value of the damaged property and lost business income. According to Hansen, the parties' issues are all classic coverage disputes, which are not appraisable. Hansen further argues that, if appraisal is compelled, the court should first resolve all coverage issues so the appraisers have a better sense of the scope of their assignment.

## I. Hansen's Filing of This Lawsuit Did Not Extinguish EMC's Right to Demand Appraisal

The parties agree that Wisconsin law governs this diversity action. *See* Def.'s Mem. 6–7 (recognizing that "Wisconsin law applies to the interpretation of the Policy and its appraisal clauses"); Pl.'s Br. 4 (relying on "longstanding Wisconsin law"). In *Lynch v. American Family Mutual Insurance Co.*, the Wisconsin Court of Appeals held that,

> absent a policy provision to the contrary, an insurance company may not demand an appraisal of a loss after the commencement of an action by the insured on that loss when the insurance company failed to demand the appraisal prior to the lawsuit even though it had an opportunity to do so.

473 N.W.2d 515, 517 (Wis. Ct. App. 1991). The Wisconsin Supreme Court later clarified that "*Lynch* did not hold that invocation of a binding appraisal clause is per se precluded after one party files suit. Rather, *Lynch* held that the insurer in that case could not invoke the appraisal

clause when it 'had ample opportunity' to do so before suit was filed." *Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.*, 2009 WI 73, ¶ 36, 768 N.W.2d 596, 605 (citing *Lynch*, 473 N.W.2d at 519).

Wisconsin courts have provided little insight on what constitutes an "ample opportunity" to demand appraisal. The loss in *Lynch* occurred in December 1989. 473 N.W.2d at 516. The parties investigated the loss and exchanged estimates that were about $10,000 apart. In March 1990, the insurer tendered payment consistent with its estimate. A few months later, in August 1990, the insurer noted that the parties were unable to agree on the amount of the loss and referenced the appraisal provision of the homeowners' policy. *Id.* at 516–17. The policyholders filed suit in September 1990. *Id.* at 517. The insurer responded by asserting that the insurance policy was subject to the appraisal clause and by moving to stay the proceedings pending appraisal. The trial court granted the request to stay. On appeal, the court of appeals reversed, concluding without explanation that the insurer "had ample opportunity to demand appraisal before [the policyholders] filed suit." *Id.* at 519.

Since the court of appeals decided *Lynch* in 1991, only two other Wisconsin courts have addressed the ample opportunity standard. In *Farmers*, the insurer demanded appraisal about a year after the policyholder filed suit and nearly two years after the loss occurred and the parties exchanged estimates. 2009 WI 73, ¶¶ 4–15. The Wisconsin Supreme Court indicated that, given that sequence of events, "it [was] far from conclusive that *Lynch* would have prevented [the insurer] from invoking and enforcing the appraisal process." *Id.* ¶ 36. However, the court ultimately didn't need to "reach *Lynch*'s application . . . because the parties agreed in writing to the appraisal process specified in the Policy." *Id.* The Wisconsin Court of Appeals later distinguished *Lynch* in an unpublished decision, noting that the policyholder in

6

*Lynch* "had provided an estimate of the amount of loss to the insurer prior to the commencement of the suit." *Park Meadows Homes Ass'n, Inc. v. Am. Family Mut. Ins. Co.*, No. 2018AP1484, 2019 WL 3139842, 2019 Wisc. App. LEXIS 392, at *14 (Wis. Ct. App. July 16, 2019). In contrast, the policyholder in *Park Meadows* did not respond to the insurer's repeated requests for an amount of loss prior to filing suit. The court held that the insurer did not have ample opportunity to invoke the appraisal clause earlier, finding that appraisal cannot be invoked until the policyholder provides an amount of loss. *Id.* at *11–15.

To the extent *Lynch* remains good law in Wisconsin,[2] I find that EMC did not have ample opportunity to invoke the binding appraisal provision prior to Hansen filing this suit. The policy unambiguously provides that appraisal cannot be demanded unless and until the parties disagree on the amount of loss.[3] Although it's undisputed that Hansen provided an estimate of its loss in February 2022, it wasn't clear that the parties had failed to reach agreement about the amount of loss until much later. EMC promptly paid the portions of the claim that were not in dispute and, as Hansen admits, the parties spent much of 2022 and the first part of 2023 hashing out a significant coverage issue. They even tried to mediate their differences in February 2023, but they failed to reach agreement. EMC could not invoke appraisal prior to the mediation because at that time the insurer did not know that an impasse had been reached. *See Lyon v. Am. Family Mut. Ins. Co.*, 617 F. Supp. 2d 754, 759–60 & n.8 (N.D. Ill. 2009) (analyzing a materially indistinguishable appraisal clause and finding that the parties cannot fail to agree on the amount of loss until there's a clear breakdown in

---

[2] Most other courts do not follow *Lynch*'s rigid approach to appraisal demands. *See, e.g., Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 199–202 (2d Cir. 2012) (finding only a single case that appeared to follow a similar approach as *Lynch*).

[3] The policy is silent, however, as to whether a lawsuit preempts appraisal.

negotiations about the amount of loss); *see also Terra Indus., Inc. v. Commonwealth Ins. Co. of Am.*, 981 F. Supp. 581, 598–99 (N.D. Iowa 1997) (finding that similar policy language "contemplate[d] a demand for appraisal *at any time* after an impasse has been reached").[4] Hansen's filing suit signaled that negotiations had broken down, and EMC demanded appraisal the following day. One day clearly is not an "ample" amount of time.

Hansen insists that the mediation focused on coverage issues, not disputes in valuation, but even if true, that fact does not help the company's argument. All that would mean is that the pricing dispute took a back seat to the coverage issues until *after* Hansen filed suit. Indeed, it wasn't until May 2023—over two months later—that EMC provided Hansen with a memo outlining its estimated construction cost differences. *See* Dowell Decl. Ex. 1, ECF No. 33-1. The focus on coverage issues therefore may have actually delayed the event triggering appraisal.

Other facts support that EMC did not have ample opportunity to invoke appraisal earlier. For example, it's undisputed that, at the time Hansen filed suit, the adjustment of the property damage portion of the claim was still open, EMC was still awaiting further information on the costs and losses actually incurred by Hansen for repair work that was either in progress or not yet commenced, and EMC was still awaiting Hansen's final property damage claim. Def.'s Facts. ¶¶ 8–9. Moreover, Hansen updated its lost business income claim just a few weeks before Hansen filed this action. *See id.* ¶ 10; *see also* Hansen Aff. ¶¶ 20–23, ECF No. 44. These facts illustrate that EMC was not dilatory in demanding appraisal, as the parties still had work to do on Hansen's claims.

---

[4] Like the policy in *Terra Industries*, the policy here provides that an insured loss is not payable until "a satisfactory proof of loss is received, and the amount of the loss has been established either by written agreement . . . or the filing of an appraisal award." ECF No. 1-2 at 166. This language further supports that a disagreement on the amount of loss necessarily presupposes a breakdown in negotiations.

8

Case 2:23-cv-00362-SCD    Filed 05/03/24    Page 8 of 13    Document 79

Accordingly, Hansen's filing of this lawsuit did not cut off EMC's recourse to the appraisal process.

## II. The Undisputed Facts Show That Hansen and EMC Do Not Agree on the Amount of the Loss for the Company's Claims

The parties agree that, under the plain language of the policy and longstanding Wisconsin law, appraisal panels place a value on a loss, but they are not allowed to decide coverage. *See* Def.'s Mem. 9–11; Pl.'s Br. 8–12. EMC contends that the vast majority of the parties' dispute concerns the extent of damage and pricing, not legal questions of coverage. EMC says the total amount of loss in dispute is about $6.5 million: $5,486,865 in construction cost differences between what Hansen claimed and what EMC's consultants have determined is a like kind repair of the facility and a difference of about $1,000,000 in the parties' lost business income calculations.

Hansen maintains that the differences in the parties' estimates result not from differences in the extent of damage or pricing, but rather from EMC's insistence that the policy does not cover the floor heave damage. According to Hansen, EMC's consultants did not include the cost to repair the floor heave damage in its estimates, and Hansen did. In other words, Hansen accuses EMC of not comparing apples to apples and of attempting to masquerade a coverage dispute as a dispute of the amount of loss.

EMC concedes coverage on Hansen's lost business income claim. The insurer hired a forensic accountant, Steven Reed, to investigate that claim and, after working with Hansen's controller, the parties agreed on the amount of loss through November 2021. *See* Reed Decl. ¶¶ 1–6, ECF No. 34. EMC subsequently paid Hansen over $300,000 on that claim. Because the facility remains inoperable, Hansen has updated its claim over time. Reed indicates that

9

Case 2:23-cv-00362-SCD    Filed 05/03/24    Page 9 of 13    Document 79

the valuation differences between his calculations and Hansen's updated claim calculation is nearly $1 million over a thirty-month period. Reed Decl. ¶ 11.

Hansen does not address the purported valuation dispute concerning the company's lost business income claim anywhere in its summary judgment brief. *See* Pl.'s Br. 1–14. The company does, however, dispute EMC's proposed fact, suggesting that EMC's estimates do not account for damages resulting from floor movement. *See* Pl.'s Resp. to Def.'s Facts ¶ 15, ECF No. 42. As support, Hansen cites the deposition testimony of EMC's construction consultant, Daniel Dowell. *See* Seese Decl. Ex. A, ECF No. 45-1. But Dowell's role in the case is limited to evaluating the construction cost differences between the parties; he never assessed Hansen's lost business income claim. *See* Dowell Decl., ECF No. 33; *see also* Dowell Decl. Ex. 1. Moreover, Hansen presents no evidence to suggest that the floor coverage issue accounts for the difference between Reed's estimates and the company's calculations. Reed never mentions floor damage. Rather, he says that Hansen has not provided sufficient support for its claim. Reed Decl. ¶¶ 7–11. It's therefore undisputed that the parties are far apart on the amount of loss associated with Hansen's lost business income claim.

The undisputed facts also show that the parties do not agree on the cost to repair the damaged floor, notwithstanding whether the policy covers that loss. The parties strenuously dispute the cause of the floor heaving and whether it's a covered loss. Nevertheless, EMC obtained estimates for what it would cost to demolish, excavate, and replace the damaged concrete floor slab. Based on those estimates, Dowell indicates that the parties are nearly $3 million apart on the cost to replace the concrete slab. Dowell Decl. Ex 1, at 3–4. Hansen seems to believe that Dowell's estimate does not account for damage from the floor movement. But his memo directly refutes this belief. Dowell separated the cost of repairing the concrete slab

10

from the other construction costs because of the coverage dispute. Thus, the purported $3 million difference represents a disagreement about the amount of loss *assuming that the policy covers it*. The causation issue therefore is irrelevant to that pricing dispute. *See Gronik v. Balthasar*, Nos. 10-CV-00954 and 11-CV-00697, 2014 WL 2739333, 2014 U.S. Dist. LEXIS 82207, at *10–19 (E.D. Wis. June 17, 2014) (finding that appraisal is appropriate even if there are coverage issues intertwined with amount of loss issues); *Windsor v. State Farm Fire & Cas. Co.*, No. 22-CV-734-SCD, 2023 WL 4197462, 2023 U.S. Dist. LEXIS 110300, at *14–20 (E.D. Wis. June 27, 2023) (concluding that hybrid causation/coverage disputes are appraisable).

EMC also concedes coverage on the non-slab related property damage claim. The non-slab construction costs include electric; fire protection; refrigeration; structural steel; architectural, structural, and mechanical/electrical/plumbing fees; and masonry. *See* Dowell Decl. Ex. 1. EMC has paid Hansen nearly $7 million for those covered damages. However, Dowell indicates that the parties remain more than $2.5 million apart. *See id.* (showing $5,486,865 in total cost differences and $2,950,800 in cost differences relating to the concrete floor slab).

Hansen does not attempt to poke any holes in the construction cost estimates provided by EMC. Instead, the company says that Dowell's memo is insufficient to establish a dispute over the amount of loss to the building because Dowell did not include the cost to repair the heaved concrete floor, and Hansen did. Hansen attempts to support this argument by pointing to excerpts from Dowell's deposition, where Dowell testified that, aside from the excavation and concrete work, his estimates account for only the roof collapse damage. *See* Seese Decl. Ex. A. It appears Dowell simply meant that he separated the differences for the covered roof related collapse damages from the damages associated with the floor slab because there's a

11

coverage dispute concerning the floor. Dowell's deposition testimony does not show that he compared costs that included floor-related damages with costs that excluded them, as Hansen suggests. Moreover, Hansen has not provided a breakdown of the costs included in its property damage claim. Nor does the company provide any evidence contradicting Dowell's comparisons. It's therefore undisputed that the parties are far apart on the amount of loss associated with Hansen's non-slab related property damage claim.

Accordingly, the undisputed facts show that all three of Hansen's insurance claims fall within the scope of the policy's appraisal provisions because the parties do not agree on the amount of loss associated with each claim.

### III. The Policy's Binding and Mandatory Appraisal Process Should Not Be Held Up While the Parties Litigate Coverage Issues

The policy's appraisal process is binding and mandatory once properly invoked. *See* ECF No. 1-2 at 166 ("If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. . . . The appraisers will then determine and state separately the amount of each loss."); *see also Farmers*, 2009 WI 73, ¶ 34 ("If and when one party invokes [the appraisal] clause, the other side must abide by it."). Despite the plain language of the policy and clear Wisconsin law, Hansen insists that the court should first address coverage issues. The company points to two cases that it says show "that compelling appraisal before resolving coverage issues only invites unnecessary fights and complexity." Pl.'s Br. 12–14 (citing *St. Croix Trading Co./Direct Logistics, LLC. v. Regent Ins. Co.*, 2016 WI App 49, ¶¶ 2, 6, 16–17, 19, 882 N.W.2d 487, 489–90, 492–93; *Gronik*, 2014 U.S. Dist. LEXIS 82207, at *3–21). Hansen, however, does not explain why we should fear those same mistakes will be repeated here, especially if the appraisal panel is properly instructed.

12

Hansen also says that deciding coverage issues before ordering appraisal is particularly reasonable here because it would allow the court to consider EMC's reliance on certain exclusions in the policy that the company urges do not apply. To that end, Hansen has moved for partial summary judgment on the exclusions issue. That motion is fully briefed and will be decided by the court shortly. Thus, the parties will obtain some clarity about the exclusions issue before commencing the appraisal process, which will then simplify and streamline issues for trial.

## CONCLUSION

Because the undisputed facts show that EMC properly demanded appraisal under the commercial insurance policy and that the parties do not agree on the amount of loss concerning the company's claims, Hansen cannot avoid the appraisal process. Accordingly, the court **GRANTS** EMC's amended motion for summary judgment on its counterclaim to compel appraisal, ECF No. 30, and **DIRECTS** the parties to follow the appraisal procedure set forth in the policy. The appraisal panel shall itemize its award so that coverage limitations and restrictions can be applied once the appraisal process has concluded.

**SO ORDERED** this 3rd day of May, 2024.

STEPHEN C. DRIES
United States Magistrate Judge