# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

HANSEN STORAGE COMPANY INC.,

     Plaintiff,

     v.                             Case No. 23-CV-362-SCD

EMPLOYERS MUTUAL CASUALTY COMPANY,

     Defendant.

---

## DECISION AND ORDER DENYING HANSEN STORAGE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

This diversity action involves a dispute between Employers Mutual Casualty Company and its policyholder, Hansen Storage Company, Inc., about damage Hansen's commercial storage facility incurred when heavy snow and ice caused its roof to collapse. EMC acknowledged coverage for most of the damages and paid Hansen millions of dollars on its claim. However, the insurer denied coverage for damage sustained to the freezer floor, asserting that several exclusions in Hansen's commercial insurance policy precluded coverage for that portion of the claim.

After the parties failed to resolve the coverage issue, Hansen filed this lawsuit seeking (among other things) declaratory judgment that no exclusion in the policy eliminates coverage for any of the damages sustained to its building. Hansen has moved for summary judgment on that claim. Although Hansen has shown an initial grant of coverage for the floor-related damage sustained to its cold storage facility, EMC has demonstrated that several exclusions in the policy may preclude coverage for that loss. The court will therefore deny the motion.

## BACKGROUND

Hansen offers warehousing space in the Milwaukee area, including a cold storage facility that was kept at five degrees and that serviced the company's largest customer. Pl.'s Facts ¶¶ 1–2, 7, 13, ECF No. 51. On February 24, 2021, the roof of the cold storage facility collapsed under the weight of snow and ice. Pl.'s Facts ¶¶ 5–12. The collapsed roof severed the facility's sprinkler lines, resulting in more water entering the space, *see* Dannewitz Decl. Ex. E, at 3, ECF No. 59-5, and a sheet of ice subsequently formed on the freezer floor, Pl.'s Facts ¶ 15. Hansen immediately reported the collapse to its insurance carrier, EMC. Pl.'s Facts ¶ 14. The commercial insurance policy issued by EMC covered losses, including damage to the cold storage facility, that occurred from September 1, 2020, to September 1, 2021. *See* Dannewitz Decl. Ex. A, ECF No. 59-1.

While clearing the facility of debris, Hansen observed more damage to the building, including a heaved (that is, displaced upward) freezer floor, a cracked concrete wall, and a buckled steel bracing frame that supported the wall. *See* Dannewitz Decl. Ex. F, at 1, ECF No. 59-6. According to Hansen, the freezer was readily accessible and fully functional prior to the roof collapse. Pl.'s Facts ¶¶ 15–20. The heaved floor, however, impaired access to the freezer and eventually heaved so significantly that the concrete floor slab had to be removed entirely.

Hansen and EMC retained engineering experts to investigate the damage to the cold storage facility. Hansen retained Giles Engineering Associates Inc. and GRAEF, while EMC retained Engineering Systems Inc. and Wiss Janney Elstner. Def.'s Facts ¶¶ 30–33, ECF No. 58. Engineering Systems' preliminary report indicated that the weight of ice and snow on the roof and the subsequent roof framing failure did not cause the floor heaving or the wall

cracking. Dannewitz Decl. Ex. B, at 11, ECF No. 59-2. The report also indicated that the damage to the steel braced frame was not consistent with the roof framing failure. *Id.* at 11–12. Thereafter, Engineering Systems and GRAEF issued a joint summary stating that the two firms were "in tentative/preliminary agreement that the upward movement of the freezer slab and the west [concrete] wall was a condition that existed prior to the snow collapse and [was] the result of long-term problems with frost heave." Dannewitz Decl. Ex. G, ECF No. 59-7. The joint summary further stated that, because GRAEF had not completed its investigation, the firm could not "definitively confirm any causation for the collapse." *Id.* A few weeks later, Engineering Systems issued a supplemental report reiterating its position that the heaved floor and related building distress was "the result of long-term issues with soil movement" and was "unrelated to the weight of ice and snow on the roof or the resulting roof framing failure." Dannewitz Decl. Ex. C, at 1, ECF No. 59-3.

Giles analyzed the soil underneath the freezer floor and issued a report of its findings. *See* Dannewitz Decl. Ex. D, ECF No. 59-4. The firm noted that the floor was composed of multiple layers, with concrete on top, followed by insulation, tubing for a floor heating system, fill material, and more concrete. *Id.* at 6. Testing revealed that the native soil under the floor system appeared to be frozen at a depth of about ten feet and showed ice lenses within the soil at depths between five-and-a-half and nine feet. Based on those findings, as well as the shallow groundwater conditions encountered, Giles indicated that "the most likely cause of the building foundation and floor distress [was] excessive foundation and floor movement caused by frost heave of the underlying soils." *Id.* at 7. The firm noted that the soil was highly susceptible to frost and, when combined with the shallow groundwater, posed a high risk for heaving.

3

After receiving the findings from Giles, GRAEF issued a report of its final conclusions. *See* Dannewitz Decl. Ex. E. The firm noted that "the depth of frost that was observed under the floor slab was deeper than what naturally occurs in [that] part of Wisconsin" and that the "depth of frost could only have been caused by the low temperatures of the freezer." *Id.* at 3. Thus, GRAEF concluded that the floor heating system must not have been operating properly, as "it would have taken months for frost of [that] depth to develop and the low temperatures from the freezer to create frost at that depth. . . . [W]ithout a functioning [heating] system, the cold from the freezer was able to freeze moisture in the ground beneath the foundation, over time to a depth below the foundations." *Id.* at 3–4. GRAEF also concluded that water from the roof collapse and the severed sprinkler lines traveled through cracks in the freezer floor and contributed to the frost heave: "It may have taken days, or weeks for this balancing-out of temperatures below the floor to occur; but as the intruding water froze, it likely caused the floor slabs and structural members above it to heave." *Id.* at 4.

Wiss Janney Elstner also issued a report about the cause of the floor heaving. *See* Dannewitz Decl. Ex. F. Based on the prior investigations, the firm determined that the soil freezing and associated heaving "occurred over a period of time that predated the roof collapse." *Id.* at 4. Wiss Janney Elstner attributed the soil freezing to "lack of a functioning under floor heating system or other effective thermal barrier between the freezer environment and underlying soil." *Id.* Given the depth of the frozen soil, the firm surmised that the floor heating system "must not have been functional for a significant period of time that predated the roof collapse." *Id.* at 5. Wiss Janney Elstner also ruled out the sprinkler water "as a primary contributary cause of the observed frozen soil and soil heave." *Id.* Overall, it concluded that the roof collapse did not cause the floor heaving and related building distress.

4

On February 22, 2022, Hansen submitted a proof of loss to EMC that included damages for the collapsed roof and the heaved floor. Pl.'s Facts ¶ 21. EMC issued a partial denial, finding that the insurance policy covered damages related to the collapse of the roof. *See* Hansen Decl. Ex. A, ECF No. 52. However, according to EMC, the policy did not cover damages to the floor system and the related building distress because those damages were caused by earth movement from frost heave. The denial letter referenced several exclusions in the policy, including for "earth movement," "settling, cracking, shrinking, bulging, or expanding," and "defects, errors, and omissions." *Id.* at 4–7. The letter also indicated that "the frost heave and related damages occurred at some unspecified point in time prior to the Roof Loss." *Id.* at 5. EMC cited the various engineer findings as support for its coverage analysis. *See id.* at 2–39.

On February 20, 2023, Hansen sued EMC in Wisconsin state court, asserting claims for declaratory judgment, breach of contract, and bad faith. *See* Compl., ECF No. 1-2 at 5–15. EMC removed the matter to federal court, ECF No. 1,[1] and the parties subsequently consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), *see* ECF Nos. 7, 11. On November 20, 2023, Hansen filed a motion for partial summary judgment on its declaratory judgment claim. *See* Pl.'s Mot., ECF No. 48; Pl.'s Br., ECF No. 49. EMC filed a brief in opposition, Def.'s Br., ECF No. 57, as well a motion to defer consideration of the summary judgment motion under Rule 56(d) of the Federal Rules of Civil Procedure, Def.'s Defer Mot., ECF No. 64. After Hansen submitted a reply brief, Pl.'s Reply, ECF No. 68, EMC moved to strike certain arguments made in the reply and a declaration submitted in support thereof, Def.'s Strike Mot., ECF No. 76.

---

[1] The court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1).

## LEGAL STANDARD

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether a genuine issue of material fact exists, I must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255).

## DISCUSSION

Hansen moves for summary judgment on its declaratory judgment claim. That claim seeks two declarations: (1) that "[n]either the Earth Movement exclusion, nor any other exclusion in the Policy, eliminates coverage for Hansen's damages arising out of or related to the roof collapse and resulting floor heave"; and (2) that "EMC has waived or is estopped from asserting any right it may have had to defenses under the Policy or otherwise because it denied coverage without conducting a proper investigation as required under the Policy and Wisconsin law." Compl. ¶ 36. Hansen does not address the second declaration in its summary judgment briefs. The court will therefore deny relief on that part of the claim. As for the first declaration, Hansen maintains that the commercial insurance policy provides coverage for the floor-related damage and that no exclusion in the policy eliminates that coverage.

6

The parties agree that Wisconsin law governs this diversity action. *See* Pl.'s Br. 10–26 (applying Wisconsin law); Def.'s Br. 3–25 (same). Under Wisconsin law, courts construe language in an insurance policy "according to its plain or ordinary meaning, consistent with what a reasonable person would understand the words to mean under the circumstances." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶ 37, 866 N.W.2d 679, 685 (citations and internal quotation marks omitted). Where the terms of the policy "are clear and unambiguous, [courts] construe the [policy's] language according to its literal meaning," *id.* (citing *Md. Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 23, 786 N.W.2d 15, 20–21), "without resort to rules of construction or principles in case law," *Danbeck v. Am. Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 629 N.W.2d 150, 154 (citing *Hull v. State Farm Mut. Auto. Ins. Co.*, 586 N.W.2d 863, 867 (Wis. 1998)).

Wisconsin courts typically follow a three-step process for analyzing insurance coverage disputes: "(1) the policy must first make an initial grant of coverage; and (2) if so, [reviewing courts] look at whether an exclusion precludes coverage; and (3) if an exclusion applies, [courts] look to see whether an exception reinstates coverage." *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 809 (7th Cir. 2012) (citing *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 24, 673 N.W.2d 65, 73). "The insured bears the burden of showing an initial grant of coverage, and if that burden is met the burden shifts to the insurer to show that an exclusion nevertheless precludes coverage." *Day v. Allstate Indem. Co.*, 2011 WI 24, ¶ 26, 798 N.W.2d 199, 206 (citing *Am. Family Mut. Ins. Co. v. Schmitz*, 2010 WI App 157, ¶ 8, 793 N.W.2d 111, 114).

Case 2:23-cv-00362-SCD    Filed 05/20/24    Page 7 of 21    Document 80

## I. Hansen Has Shown an Initial Grant of Coverage Under the Policy for the Floor-Related Damage

Hansen seeks coverage for the floor damage and related building distress under the property coverage part of its commercial insurance policy. That part of the policy provides coverage for "direct physical loss to covered property at a 'covered location' caused by a covered peril." Dannewitz Decl. Ex. A, at 31. The parties do not dispute that Hansen sustained direct physical loss to covered property at a covered location. They strenuously dispute, however, whether the floor-related loss was caused by a covered peril. The policy does not list any specific covered perils. Rather, it covers "risks of direct physical loss unless the loss is limited or caused by a peril that is excluded." *Id.* at 42.

EMC argues that Hansen cannot satisfy its burden of showing an initial grant of coverage because the floor-related damage occurred prior to the policy period. EMC agreed to "pay for a covered loss that occurs during the policy period"—that is, from September 1, 2020, to September 1, 2021. Dannewitz Decl. Ex. A, at 1, 55. The parties agree that the roof collapse occurred during that period, in February 2021. However, according to EMC, the floor was damaged much earlier. EMC says that the floor heaving occurred no later than the first quarter of 2020. As support, the insurer cites a letter Summit Refrigeration Group sent to Hansen's insurance broker in June 2021. The letter identifies a mechanical failure of a condensing unit in the floor's heating system as "a major contributing factor" to Hansen's floor heaving issue. *See* Forman Decl. Ex. A, ECF No. 62-1. The letter also indicates that, in the first quarter of 2020, a contractor disconnected the supply and return piping from that condensing unit, and there was no way to tell if there was flow through each of the circuits in the floor.

8

Contrary to EMC's suggestion, the Summit Refrigeration letter does not establish that the floor heaving occurred no later than early 2020. At most, the letter suggests that the floor heating system in Hansen's cold storage facility may have stopped functioning properly at that time. But Hansen does not seek coverage for the malfunctioning floor heating system. Rather, Hansen seeks coverage for the direct physical loss to its cold storage facility, including the damage to the freezer floor and the related building distress. Hansen has presented evidence showing that the floor heaved shortly after the roof collapsed, which was during the policy period. The Summit Refrigeration letter does not contradict that evidence.

EMC also asserts that the engineering reports establish that the floor heave damage occurred prior to the policy period. All the engineering firms agree that the freezer floor shifted upward as a result of frost heaving—that is, pockets of moisture within the soil beneath the floor froze, causing the soil to swell upward. Several of the firms concluded that this process was unrelated to the roof collapse and, in fact, had occurred prior thereto. For example, EMC's experts (Engineering Systems and Wiss Janney Elstner) indicated that the floor heave damage was the result of long-term issues with frost heave/soil movement. *See* Dannewitz Decl. Exs. B, C, and F. Wiss Janney Elstner attributed the soil freezing to the lack of a functioning under floor heating system. GRAEF (one of Hansen's experts) agreed that it would have taken months for frost to develop at the depth it was discovered and pointed to the purportedly malfunctioning heating system as a main contributing factor. *See* Dannewitz Decl. Ex. E. However, GRAEF believes that water from the roof collapse may have also contributed to the freezing soil. EMC insists that these engineering reports show that the floor heaving is pre-existing damage not covered by the commercial insurance policy.

9

Like the refrigeration letter, the engineering reports do not conclusively establish that the floor-related damage occurred prior to the inception of the policy period. At most, they show that the ground beneath the freezer floor froze sometime prior to the roof collapse. But that does not contradict Hansen's evidence that the floor actually heaved during the policy period. Indeed, the direct physical loss for which Hansen seeks coverage is the damage to its facility, not to the soil underneath. Moreover, to the extent the engineering reports suggest pre-collapse freezing of the ground, no report indicates when the ground began to freeze, let alone that the process occurred prior to September 2020.

EMC nevertheless says that "insurers are not obligated to cover losses which are already occurring when the coverage is written or which has already occurred." Def.'s Br. 3 (quoting *Am. Girl*, 673 N.W.2d at 85). That may be true. But the so-called known loss doctrine, to the extent Wisconsin courts have adopted it, "requires that at the time the policy was issued, the insured had substantial knowledge that the loss was occurring or had already occurred in order that coverage be precluded." *Atl. Mut. Ins. Cos. v. Lotz*, 384 F. Supp. 2d 1292, 1299 (E.D. Wis. 2005) (citing *Am. Girl*, 673 N.W.2d at 85). EMC presents no evidence to suggest that Hansen knew or should have known that the soil beneath its cold storage facility was already freezing at the time EMC issued the policy at issue here. It appears Hansen first learned that its floor heating system was not working properly in June 2021, when Summit Refrigeration submitted its letter—that is, months after the policy took effect.

The only other case EMC cites to support its timing argument, *Horizon West Condominium Homes Ass'n v. Travelers Indemnity Co. of Connecticut*, No. 22-3191, 2023 WL 7951194, 2023 U.S. App. LEXIS 30607 (7th Cir. Nov. 17, 2023), is factually distinguishable from our case. *Horizon West* involved a high-rise condo that was evacuated after inspectors

determined that the building was at risk of imminent collapse. 2023 U.S. App. LEXIS 30607, at *1–3. After the HOA's insurer denied coverage for the replacement cost of the building, the HOA sued for breach of contract and bad faith. *Id.* at *3–5. The district court dismissed the complaint and the Seventh Circuit affirmed, finding that the policy did not cover the HOA's claim because "the complaint [made] clear that the structural damage to the building existed before the policy took effect." *Id.* at *7–8. By that time, residents had already complained about unstable balconies and engineers had discovered that past water seepage caused beams and crossbeams to rust.

In contrast, EMC presents no evidence that the cold storage facility was damaged before the roof collapsed. EMC suggests only that the soil underneath the facility may have already been frozen but, as explained above, Hansen does not seek coverage for the frozen soil. Unlike the rusty beams in *Horizon West*, Hansen's freezer floor was not damaged until the frozen soil caused the floor to heave. And that's the direct physical loss for which Hansen seeks coverage here.

EMC also argues that the policy does not provide an initial grant of coverage for the floor heave damage because Hansen cannot show that the damage was fortuitous. In *Glassner v. Detroit Fire & Marine Insurance Co.*, the Wisconsin Supreme Court held that an insured under an "all risk" policy—like the commercial insurance policy at issue here—has "the burden of establishing not only that damage occurred, but that it was fortuitous, i.e., that it resulted from a 'risk,' as contrasted with being an ordinary and almost certain consequence of the inherent qualities and intended use of the property." 127 N.W.2d 761, 764 (Wis. 1964). According to EMC, the only fortuitous event occurring during the policy period is the roof collapse, but all

11

the experts have concluded that the floor heaving is pre-existing damage unrelated to the roof collapse.

EMC's fortuity argument fails for two reasons. First, not *all* the experts concluded that the floor movement was unrelated to the roof collapse; only the insurer's paid experts reached that conclusion. Giles indicated that the floor-related damage likely was caused by frost heave of the underlying soil, but the firm did not opine as to whether the roof collapse could have caused the frost heaving. *See* Dannewitz Decl. Ex. D. And GRAEF said that water from the roof collapse and the severed sprinkler lines *did* contribute to the frost heaving. *See* Dannewitz Decl. Ex. E. Thus, there's a disputed issue of fact as to the cause of the floor movement.

Second, EMC mistakenly assumes that pre-existing damage can never be fortuitous. The proper focus is not whether the damage existed at the time the policy took effect, but rather whether the parties "knew about or contemplated the damage's cause before the policy's issuance." *Miller*, 683 F.3d at 810 (citing *Am. Girl*, 673 N.W.2d at 76); *see also Lotz*, 384 F. Supp. 2d at 1298–99 (predicting that the Wisconsin Supreme Court would adhere to the majority view "that a loss is fortuitous if neither party knew or contemplated there was a defect in the insured property at the time the insurance contract was issued"). EMC presents no evidence that either party was aware that the soil underneath the cold storage facility was freezing at the time it issued the policy in September 2020. Although Hansen may have known about the possibility of the soil freezing, the company attempted to mitigate that risk with a floor heating system. And it was far from certain that system would break down during the policy period, let alone that the actual loss—the heaving of floor—would occur during that time. Hansen has sufficiently established that the floor-related damage resulted from a (mitigated) risk and, therefore, was fortuitous.

Accordingly, Hansen has satisfied its burden of showing an initial grant of coverage for the floor heave damage.

## II. EMC Has Shown That Several Exclusions in the Policy May Preclude Coverage for the Floor-Related Damage

EMC contends that, even if the roof collapse contributed to the floor heave damage, several exclusions preclude coverage for that loss, including (A) the earth movement exclusion; (B) the sewer backup and water below the surface exclusion; (C) the defects, errors, and omissions exclusion; and (D) the settling, cracking, shrinking, bulging, or expanding exclusion.

### A. Earth movement exclusion

EMC relies primarily on the policy's earth movement exclusion, which provides that the insurer does not pay "for loss caused by any earth movement (other than 'sinkhole collapse') or caused by eruption, explosion, or effusions of a volcano." Dannewitz Decl. Ex. A, at 43. The policy explains that "[e]arth movement includes, but is not limited to: earthquake; landslide; mudflow; mudslide; mine subsidence; or sinking, rising, or shifting of earth." *Id.* Although the policy does not specifically mention frost heave, EMC asserts that the language referencing "rising[] or shifting of earth" sufficiently captures that phenomenon.

Relying on Wisconsin caselaw, Hansen argues that the earth movement exclusion in the policy applies to only "naturally occurring" earth movement that occurs over a general area. *See* Pl.'s Br. 15–20 (citing *Wis. Builders, Inc. v. Gen. Ins. Co. of America*, 221 N.W.2d 832 (Wis. 1974) and *Am. Motorists Ins. Co. v. R & S Meats*, 526 N.W.2d 791 (Wis. Ct. App. 1994)). Hansen notes that, while frost heave can occur naturally, the undisputed facts show that the soil beneath its freezer floor did not freeze as a result of a naturally cold Wisconsin winter. According to Hansen, the human action of operating a commercial freezer with a

13

malfunctioning floor heating system, combined with the exposures created by the roof collapse, allowed temperatures from the facility to penetrate and freeze the soil below. Hansen therefore insists that, because some human action played a role in the floor movement, the earth movement exception does not apply.

The clear and unambiguous terms of the policy show that the earth movement exclusion may apply to the floor-related damage Hansen sustained to its cold storage facility. The policy broadly excludes from coverage losses caused by *any* earth movement except a sinkhole collapse. It's undisputed that the freezer floor was damaged from frost heaving, not from a sinkhole collapse. Thus, the rising or shifting of earth that caused the floor-related damage is a type of earth movement that is plainly excluded from coverage under the policy. *See Sodowski v. Nat'l Flood Ins. Program of FEMA*, 834 F.2d 653, 656 (7th Cir. 1987) (exclusion for loss caused by any earth movement except mudslide or erosion applied because it was undisputed that the settlement of the soil that caused the damage was neither a mudslide nor erosion); *Home-Owners Ins. Co. v. Andriacchi*, 320 Mich. App. 52, 63 (Mich. Ct. App. 2017) (finding the phrase "any earth movement" to mean "'every' or 'all' movement of the earth without restriction or distinction as to the type (i.e., natural or man-made)"). Because the terms of the earth movement exclusion are unambiguous, the exclusion must be enforced as written and without resort to principles of caselaw.

Moreover, considering principles of caselaw would not change the analysis, as the two cases Hansen relies upon are distinguishable from our case. In *Wisconsin Builders*, the Wisconsin Supreme Court found the term "earth movement" to be ambiguous and applied the doctrine of *ejusdem generis* (literally "of the same kind or class") to limit its scope to the same class of forces as those specifically set forth in the exclusion. 221 N.W.2d at 837–38. The

14

policy in that case precluded coverage for loss caused by "earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, earth rising or shifting." *Id.* at 834. Because the specific terms (earthquake, volcanic eruption, landslide, mudflow) referred to naturally occurring earth movement, the court suggested that the general phrase (earth sinking, earth rising or shifting) should also be so limited. The exclusion here, however, references both naturally occurring earth movement (earthquake, landslide, mudflow, mudslide) and earth movement that unquestionably has a man-made cause (mine subsidence). Thus, applying the *ejusdem generis* doctrine would not narrow the earth movement exclusion as Hansen desires. *See Taja Invs. LLC v. Peerless Ins. Co.*, 196 F. Supp. 3d 587, 596–97 (E.D. Va. 2016) (finding earth movement exclusion with language nearly identical to the policy language here to plainly apply to both natural and man-made phenomena); *Andriacchi*, 320 Mich. App. at 63–64 (finding reliance on *ejusdem generis* doctrine misplaced where exclusion cited examples of earth movement that could occur naturally or be caused by man); *One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2014 WL 4977331, 2014 U.S. Dist. LEXIS 142025, at *22 (N.D. Ill. Oct. 6, 2014) ("Moreover, these cited examples are not of one type or the other since landslides certainly can occur naturally or be caused by man, as can the 'sinking, rising or shifting' of earth.").

The policy here also contains what is known as an anti-concurrent cause provision. That provision, which precedes the exclusions listed in the policy, indicates that EMC does not pay

> for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

15

Dannewitz Decl. Ex. A, at 42. In *Wisconsin Builders*, the Wisconsin Supreme Court quoted with approval *Wyatt v. Northwestern Mutual Insurance Co. of Seattle*, 304 F. Supp. 781, 783 (D. Minn. 1969), which held that "not all earth movements, or at least those where *some human action* causes such are included in the exclusion." *Wis. Builders*, 221 N.W.2d at 838 (emphasis added). The Wisconsin Court of Appeals relied on that language to read "*Wisconsin Builders* to say that if the earth movement is due to human action, coverage is not lost." *Am. Motorists*, 526 N.W.2d at 796. But, given the anti-concurrent cause language in our policy, the earth movement exclusion would still apply if some human action along the causal chain contributed to the floor heaving.

Wisconsin courts have relied on anti-concurrent cause provisions to exclude coverage in insurance disputes involving multiple causes. For example, in *Schmitz*, a home collapsed after a period of unusually heavy rain. 793 N.W.2d at 113. The insurer filed a declaratory judgment action arguing that water and earth movement exclusions precluded coverage for the loss. *Id.* at 113–14. In response, the homeowner argued that the loss was covered under supplemental collapse coverage because it was caused by a lack of a retaining wall (i.e., a defective method of construction, a covered peril). *Id.* at 114. The trial court ruled in favor of the homeowner, finding that the damage would not have occurred if a retaining wall had been present. The Wisconsin Court of Appeals reversed based on the anti-concurrent cause provision in the policy. *Id.* at 118–19. The court explained that, "[i]f no water had come through the . . . home, the lack of retaining wall would have been irrelevant because there was no damage until the water came through. . . . Defective methods of construction did not really cause the *damage* so much as it caused a failure to prevent it." *Id.* at 119. Similarly, in *Hughes v. Allstate Indemnity Co.*, the Wisconsin Court of Appeals relied on an anti-concurrent cause

16

provision to affirm the denial of coverage for water damage to a home because water (an excluded peril), rather than leaving a spigot on (a covered peril), was the predominant cause of the loss. No. 2019AP1234, 2019 WL 6205101, 2019 Wisc. App. LEXIS 625 (Wis. Ct. App. Nov. 21, 2019).

Here, the undisputed facts show that earth movement was the driving force behind the floor-related damage. Hansen insists that the human action of operating a commercial freezer with a malfunctioning floor heating system contributed to the floor heaving. That might prove true. But, like in *Schmitz*, even if the covered peril were a but-for cause of the harm, it was not a *sufficient* cause of the harm: the damage from a faulty heating system would not have occurred without the frost heave and earth movement. "Defective methods of construction did not really cause the *damage* so much as it caused a failure to prevent it." 793 N.W.2d. at 119. Because it is undisputed that the freezer floor was damaged when the soil beneath the floor swelled upward, the earth movement exclusion applies regardless of what caused the soil to freeze. *See Andriacchi*, 320 Mich. App. at 70 ("This lead-in phrase, in conjunction with the broad earth-movement provision, reinforces the notion that the exclusion applies to any earth movement, because the exclusion applies even if it occurs in part because of a concurrent cause or event."); *One Place Condo.*, 2014 U.S. Dist. LEXIS 142025, at *21–22 ("[T]he language is clear in stating that the limitation applies to losses from *any* earth movement *regardless* of the cause."); *Lickety Split Drive-In, Inc. v. Am. States Ins. Co.*, No. 02-3008, 2003 WL 21378162, 2003 Wisc. App. LEXIS 432, at *16 (Wis. Ct. App. Apr. 29, 2003) ("The broken water main is irrelevant—it was simply the first part of a sequence the [policyholders'] own expert concluded culminated in frost heaving, which is earth movement excluded by the policy.").

17

*Wisconsin Builders* and *American Motorists* are also factually distinguishable from our case. In *Wisconsin Builders*, a policyholder sought coverage for a collapsed apartment building that was constructed at the foot of a partially excavated bluff. 221 N.W.2d at 833–35. The earth movement therefore was clearly caused by human action (i.e., as design defect). *American Motorists* involved floor heave damage sustained to a freezer room after rainwater accumulated near a loading dock area, flowed underneath the floor, and froze. 526 N.W.2d at 792. Investigation revealed that the accumulation of water was due to the city's failure to connect a storm sewer. Again, that's clearly human action. In our case, however, the undisputed facts show that the floor-related damage was caused by frost heave, which occurs naturally when pockets of moisture within the soil freeze. Most of the experts attribute the soil freezing to an unexplained failure in the floor heating system. It's unclear whether human action contributed to that failure but, even if it did, it does not appear to be the type of active third-party negligence present in *Wisconsin Builders* and *American Motorists*.

In sum, the court cannot say as a matter of law that the earth movement exclusion eliminates coverage for its floor-related damage.

### B. Subsurface water exclusion

The subsurface water exclusion provides that EMC does not pay "for loss caused by or resulting from . . . water below the surface of the ground, including but not limited to water that exerts pressure on or flows, seeps, or leaks through or into a covered building." Dannewitz Decl. Ex. A, at 44. Hansen argues that its loss was not caused by and did not result from water below the surface of the ground. According to Hansen, the loss resulted from snow, water, and ice that penetrated the building during the roof collapse. EMC, however, disputes that fact, citing the reports of several engineering experts. Even if the roof collapse did contribute

18

to the floor-related damage, that finding would not eliminate the applicability of this exclusion because, like the earth movement exclusion, the subsurface water exclusion is preceded by the anti-concurrent cause provision. Hansen also argues that no water exerted pressure on, or flowed, seeped, or leaked through the freezer floor. But it's undisputed that frost heave caused the floor-related damage and, without water, the soil never would have frozen. *See Oak Tree, Inc. v. Commercial Union Ins. Co.*, 720 F. Supp. 92, 93 (E.D. Mich. 1989) (finding that subsurface water exclusion applied where rainwater penetrated the ground and froze, causing basement floor to heave: "Water is still water—even though it is in frozen form and exerts pressure causing the ground to heave and the walls to crack."); *Loretto-Utica Props. Corp. v. Douglas Co.*, 630 N.Y.S.2d 917, 919 (N.Y. Sup. Ct. 1995) ("The fact that the moist soil froze is of no moment. Without water being present in the soil in the first instance, the damage would not have been caused."). Finally, Hansen says that this exclusion is limited to natural flooding events. The only authority the company cites in support of that argument relates to burst pipes underground, a situation not present here. The court therefore cannot say that the subsurface water exclusion eliminates coverage for the floor-related damage as a matter of law.

### C. Defects exclusion

According to the defects exclusion, EMC does not pay "for loss which results from . . . an act, error, or omission (negligent or not) relating to . . . the design, specification, construction, workmanship, installation, or maintenance of property." Dannewitz Decl. Ex. A, at 45. EMC asserts that this exclusion bars coverage for the floor-related damage to the extent that the failure of the floor heating system is a defect in workmanship or design. Hansen argues that the supposedly malfunctioning heating system does not fall within the scope of the defects exclusion because there is no evidence that the system was defectively

19

constructed, installed, or designed. But that's not true. The Summit Refrigeration letter identifies both a mechanical failure and the work of a contractor as potential causes for the system not working properly. Hansen also insists that that loss was caused by the roof collapse, a covered peril. But, as should be clear now, that material fact is genuinely disputed. The court therefore cannot say as a matter of law that the defects exclusion would not apply here.

### D. Settlement, shrinking, and cracking exclusion

Finally, the policy provides that EMC does not pay "for loss caused by settling, cracking, shrinking, bulging, or expanding of pavements, footings, foundations, walls, ceilings, or roofs." Dannewitz Decl. Ex. A, at 47. Hansen again argues that this exclusion does not apply because the floor-related damage was caused by the roof collapse and, at most, the displaced floor was a concurrent cause of the company's loss. Again, because this is a disputed fact, summary judgment on the settlement, shrinking, and cracking exclusion is precluded.

### CONCLUSION

Although Hansen has satisfied its burden of showing an initial grant of coverage for the floor-related damage sustained to its cold storage facility, EMC has demonstrated that several exclusions in the commercial insurance policy may preclude coverage for that loss. The court therefore **DENIES** Hansen's motion for partial summary judgment, ECF No. 48. Because the current record shows that Hansen is not entitled to summary judgment on its declaratory judgment claim, the court **DENIES as moot** EMC's motion to defer consideration of Hansen's motion for summary judgment, ECF No. 64. Finally, because Hansen permissibly submitted a declaration in support of its summary judgment reply brief, *see* E.D. Wis. Civ. L. R. 56(b)(3)(C), and because Hansen's reply arguments are within the

scope of the arguments EMC made in its opposition brief, the court **DENIES** EMC's motion to strike, ECF No. 76.

      **SO ORDERED** this 20th day of May, 2024.

                                   _____
                                   STEPHEN C. DRIES
                                   United States Magistrate Judge